UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HUBERT GOODMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-02542-JRS-MJD |
| | ) | |
| CUMMINS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Summary Judgment**

Plaintiff Hubert Goodman sued his former employer, Defendant Cummins, Inc., alleging that Cummins subjected him to disparate treatment, a hostile-work environment, and constructive discharge on account of Goodman's race and nationality. Goodman brings claims under the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* Cummins has moved for summary judgment on all claims. The Court decides as follows:

## I.    Factual Background

Plaintiff Hubert Goodman began working for Defendant Cummins, Inc. in May 1997 and he has held a number of positions during his tenure with Cummins. Cummins operates worldwide and places certain high-potential employees in temporary assignments in another country for a term of six months to three years, known as "expatriate" assignments. (Linda Shi Decl. ¶ 3, ECF No. 60-3; Lisa Eckelkamp Dep. 10–12, ECF No. 60-4.) These expatriate assignments are viewed as an investment in

Cummins employees. (Shi Decl. ¶ 3, ECF No. 60-3.) From 2010 to 2013, Goodman held an expatriate assignment in Singapore. From 2013 to 2016, he held an expatriate assignment in Vietnam, working as a Managing Director for a joint venture between Cummins and the Swiss-based company DKSH. (Goodman Dep. 21, ECF No. 60-1; Jensen-Muir Decl. ¶ 3, ECF No. 60-2.) Goodman's general responsibilities in that position were sales, service, and support, including people management, profit and loss responsibility, and being part of the leadership team for Asia Pacific. (Goodman Dep. 79, ECF No. 60-1.) He reported to the Executive Managing Director of Asia Pacific, Peter Jensen-Muir, and the Board of Directors for the joint venture. (Goodman Dep. 15, ECF No. 60-1; Jensen-Muir Dep. 6, ECF No. 60-2.) Goodman ultimately resigned from Cummins effective September 30, 2016. He claims he was constructively discharged.

During the time that Goodman was on his expatriate assignment in Vietnam, he received satisfactory performance evaluations. (Jensen-Muir Decl. ¶ 11, ECF No. 60-2.) He received raises and bonuses. He never received an unsatisfactory evaluation or a warning about his job performance. And Goodman was never advised by anyone at Cummins that his job was in jeopardy. (Goodman Dep. 282, ECF No. 60-1.)

The expiration of his expatriate assignment in Vietnam required Goodman to find another role at Cummins. (Shi Decl. ¶ 6, ECF No. 60-3.) Cummins does not hold a particular job open in an employee's home country when the employee accepts an expatriate position. (Shi Decl. ¶ 4, ECF No. 60-3.) Instead, an employee must network with other Cummins employees to identify a potential role. (Satterthwaite Dep.

2

110, 116, ECF No. 60-8.) Goodman understood that he could return to the United States without having a role and Cummins would allow him to find a role upon his return. (Goodman Dep. 160, ECF No. 60-1.)

In July 2015, Goodman requested from Jensen-Muir information on relocating back to the United States and on a one-way move to Asia (i.e, working in a localized role without expecting to repatriate). (Jensen-Muir Decl. ¶ 9, ECF No. 60-2.) Jensen-Muir committed to working with Goodman to find a role in the United States and supporting his business travel to the United States to facilitate his search. (*Id.*) Jensen-Muir confirmed in subsequent communications with Goodman that Cummins would repatriate him. (*Id.*) In late 2015, President of the Distribution Business Unit Tony Satterthwaite informed Jensen-Muir that Goodman had requested consideration for "localizing"—transitioning to local employment status without the expectation of repatriation back to the home country— in Vietnam. (*Id.*; Shi Decl. ¶ 5, ECF No. 60-3.) But by then the joint venture board was already interviewing candidates for Goodman's replacement. (Jensen-Muir Decl. ¶ 13, ECF No. 60-3.)

In December 2015, Goodman explored an opportunity with the joint venture rather than returning to the United States. (Goodman Dep. 113–14, ECF No. 60-1.) Goodman understood that the board had decided they would probably bring in a new person, but he asked for consideration anyway. (Goodman Dep. 116, ECF No. 60-1.) The board concluded that another candidate, Milind Madani, was the superior candidate for the position. (Jensen-Muir Decl. ¶ 18, ECF No. 60-2.) In April 2016, Jensen-Muir again contacted Satterthwaite and the Executive Director of Human Resources

for Distribution to reiterate his support for repatriating Goodman to the United States. (Jensen-Muir Decl. ¶ 19, ECF No. 60-2.)

In early April 2016, Goodman filed a complaint through Cummins' Ethics Point website, complaining about certain interactions with Jensen-Muir. (Goodman Dep. 167 & Ex. 13, ECF No. 60-1; Shi Decl. ¶ 8, ECF No. 60-3.) Then in mid-May, Goodman emailed the President of the Distribution Business Unit, Tony Satterthwaite, claiming that Jensen-Muir had been "badmouthing" him. (Shi Decl. ¶ 8 & Ex. 7, ECF No. 60-3.) Satterthwaite responded that he was unaware of any such "badmouthing," but he would ask Shi to initiate an investigation. (Satterthwaite Dep. 123–24, & Ex. 20; ECF No. 60-8.) Both matters were referred to Right Environment Manager for Asia Pacific, Stacey Gard, for investigation. (Shi Decl. ¶ 8 & Ex. 8; ECF No. 60-3.) In the course of her investigation, Gard tried several times to contact Goodman, but he failed to respond. (Shi Decl. Ex. 8, ECF No. 60-3 at 145.) At the end of her investigation, which included interviewing three witnesses identified by Goodman, Gard concluded that Goodman's complaints were unsubstantiated. (Shi Decl. Ex. 8, ECF No. 60-3 at 138, 144.)

In June 2016, while Goodman was in the United States, Jensen-Muir offered to extend Goodman's expatriate assignment to allow him more time to find a U.S. role. (Goodman Dep. 199, ECF No. 60-1; Jensen-Muir Decl. ¶ 21, ECF No. 60-2.) Jensen-Muir understood that Goodman wanted to consider the offer and wait until the week of July 4, 2016 to respond. (Jensen-Muir Decl. ¶ 21, ECF No. 60-2.) Goodman accepted the three-month extension, making his Vietnam assignment end date October

15, 2016. (Goodman Dep. 202, ECF No. 60-1.) Goodman understood that he could return to the U.S., that is, repatriate, without having a role and find a role upon his return. (Goodman Dep. 160, ECF No. 60-1.)

On July 11, 2016, Goodman sent an email to Vice President - Chief Human Resources Officer Jill Cook, notifying Cummins that he had "been subjected to illegal discrimination on the basis of national origin, additionally age and race." (Goodman Dep. 235–36 & Ex. 25, ECF No. 60-1; Shi Decl. ¶ 12, ECF No. 60-3.) Goodman's email did not provide any detailed information about the alleged discrimination. The complaint was referred to Director of Human Resources – Service Functional Talent Management, Larry Williams, for investigation. (Shi Decl. ¶ 12, ECF No. 60-3.) Williams interviewed several witnesses, including Goodman, and in mid-August 2016, determined that the complaint was unsubstantiated. (Shi Decl. Ex. 10, ECF No. 60-3 at 156.)

Before Goodman's expatriate assignment ended, Cummins presented him with several employment opportunities, but he decided not to pursue them. (Compl. ¶¶ 106–07, ECF No. 1.) First, Robert Enright, General Manager of New and ReCon Parts in Cummins' Supply Chain Organization, emailed Goodman on June 1, 2016, and spoke with him around June 8, about a potential relationship manager role in his organization, with a potentially higher salary grade level than his current level. Goodman stated that he would get back to Enright in early July about his interest in the role. (Enright Decl. ¶ 4, ECF No. 60-10.) However, Goodman failed to respond throughout July and in late August emailed Enright, declining to be considered for

the position in favor of "wait[ing] till my return before committing to a role." (Good-man Dep. 222–23, 225, 226, ECF No. 60-1; Enright Decl. ¶¶ 4-6 & Ex. 1, ECF No. 60-10.) By that time, Enright had started moving forward and asked Goodman to advise if he would like to be included in the process. (Enright Decl. ¶¶ 5-6 & Ex. 1, ECF No. 60-10.) Goodman advised Enright that he did not have an interest in being included in the selection process for the role. (*Id.*) Enright ultimately hired Patrick Wolf for the position, and as of the date of Enright's declaration at the end of October 2018, Wolf was still in that role. (Enright Decl. ¶ 8, ECF No. 60-10.)

Second, around August 15, 2016, Norbert Nusterer, President of the Power Systems Business Unit, contacted Goodman about potential project manager roles in his business unit. Nusterer said that he did not actually have a job, but was willing to find something for Goodman. (Goodman Dep. 244–46, ECF No. 60-1; Nusterer Dep. 49 & 99, ECF No. 60-9 at 4.) At first Goodman was interested, but the next day he told Nusterer that he preferred not to pursue any opportunities in the Power Systems space and that he had lost all trust in Cummins. (Goodman Dep. 246–47, ECF No. 60-1; Nusterer Dep. 49 & Ex. 99, ECF No. 60-9 at 5.)

In addition, during Goodman's June 2016 visit, Bill Haley, the Supply Chain Leader (and part of the distribution leadership team) said to Goodman that if he could not find a role, Haley would give him a job. (Goodman Dep. 226, ECF No. 60-1.) Yet Goodman never pursued that opportunity.

In late August, Cummins paid for Goodman to go on a "repatriation" trip with his wife to explore job and housing opportunities in the United States. (Shi Decl. ¶ 13, ECF No. 60-3.) Within a week of returning from that trip, on September 8, 2016,

Goodman resigned from Cummins, effective September 30, 2016. (Goodman Dep. 239–40 & Ex. 30, ECF No. 60-1 at 97–99.) Goodman's resignation letter cites alleged discrimination by Jensen-Muir as the sole reason for his resignation. (Goodman Dep. Ex. 30.)

At the time of his resignation, Goodman was in good standing, Cummins had not made any decision to end his employment, no one at Cummins had told Goodman that his job was in jeopardy, and Goodman knew that he could find a role upon returning to the United States. (Goodman Dep. 160, 282, ECF No. 60-1; Jensen-Muir Decl. ¶ 29, ECF No. 60-2.) Cummins considered Goodman's departure as a loss. (Jensen-Muir Decl. ¶ 29, ECF No. 60-2.)

During discovery, Cummins learned that before he left Cummins, Goodman understood that Phu Thai Industries wanted to hire him. (Goodman Dep. 37–38, ECF No. 60-1.) Within a day of his resignation from Cummins, Phu Thai offered Goodman $9,000 per month. (Goodman Dep. 38, ECF No. 60-1.) Goodman currently lives in Vietnam. (Goodman Dep. 8, ECF No. 60-1.) Goodman filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, alleging that he was deliberately excluded from job assignments on the basis of his race, age, and national origin. He contends that only Jensen-Muir unlawfully discriminated against him. (Goodman Dep. 27–28, ECF No. 60-1.)

## II.    Discussion

Goodman brings claims for disparate treatment, hostile-work environment, and constructive discharge under the Equal Protection Clause under 42 U.S.C. § 1981 and

Title VII, 42 U.S.C. § 2000e *et seq.* Therefore, the Court may properly exercise federal-question subject matter jurisdiction under 28 U.S.C. § 1331.

Cummins seeks summary judgment on all of Plaintiff's claims. In responding to the summary judgment motion, Goodman does not address Cummins' arguments for summary judgment on his hostile-work environment and disparate treatment claims. And Goodman previously abandoned his claims based on his nationality. (*See* Pl.'s Statement of Claims, ECF No. 58.) Therefore, Goodman is considered to have abandoned any such claims and summary judgment will be granted Cummins on those claims. As a result, the Court's discussion focuses on the claim for constructive discharge based on race.

## A. Summary Judgment

"A district court properly grants summary judgment where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019), *petition for cert. filed*, (U.S. June 3, 2019) (No. 18-1504). A court must draw all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The non-movant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-movant fails to establish an essential element of his case, there is a complete failure of proof, and the movant is entitled to judgment as a matter of law. *Id.* at 323. The non-movant "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Giles*, 914 F.3d at 1048 (stating that the non-movant must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture"). Where the "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted).

### B. Constructive Discharge

Cummins seeks summary judgment on Goodman's constructive discharge claim. To establish constructive discharge, a plaintiff must be able to show that "from the standpoint of the reasonable employee, the working conditions [had] become unbearable." *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). The Seventh Circuit recognizes two forms of constructive discharge; both require "that the work environment had become unbearable." *Chapin v. Fort–Rohr Motors, Inc.,* 621 F.3d 673, 679 (7th Cir. 2010); *see also Wright*, 798 F.3d at 527–28. In the first form, an employee resigns because of discriminatory harassment. *Chapin,* 621 F.3d at 679. This requires "a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* In the second form, "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Wright*, 798 F.3d at 527 (quoting *Chapin*, 621 F.3d at 679). A plaintiff must establish that *"the employer's actions*

9

communicate[d] to the employee that she immediately and unavoidably will be terminated." *Id.* at 528–29 (emphasis in original). A plaintiff also is required to show that "a *reasonable* person would believe that her employer had *acted in a manner that communicated* that the employee would be terminated imminently, not simply whether the employee reasonably thought she would be terminated." *Id.* at 528 (emphasis in original).

Cummins argues summary judgment on the constructive discharge claim is appropriate because no reasonable person in Goodman's position would have found his working conditions unbearable or would have believed his termination was imminent. Cummins also argues that Goodman's rejection of multiple opportunities to extend his employment and his voluntary resignation preclude his constructive discharge claim. Further, Cummins contends that Goodman has no evidence that his race caused his constructive discharge.

Goodman responds that based on the evidence, a reasonable jury could find that his discharge was "imminent and inevitable." Goodman does not maintain that he resigned because of discriminatory harassment, relying solely on the second form of constructive discharge. He also argues that a reasonable jury could find that Cummins would not have constructively discharged him had he not been African American and everything else had been the same.

The Court finds that Goodman has come forward with insufficient evidence to raise a reasonable inference that his discharge was in fact imminent and unavoidable at the time he resigned. And Goodman has not identified any evidence that would

allow a reasonable jury to find that Cummins' actions communicated to him that he would be "immediately and unavoidably . . . terminated." *Wright*, 798 F.3d at 528–29 (emphasis in original).

In *EEOC v. University of Chicago Hospitals,* 276 F.3d 326 (7th Cir. 2002), the Seventh Circuit held that the EEOC had "demonstrated that a reasonable employee standing in [the employee's] shoes would have believed that had she not resigned, she would have been terminated." *Id.* at 332. In that case, when the employee arrived at work, "her belongings were packed, and her office was being used for storage." *Id.* Other evidence pointed to an immediate termination: the employee knew of her supervisor's "intent, plan, and attempt to terminate her." *Id.* In *Kodish v. Oakbrook Terrace Fire Protection District,* 604 F.3d 490 (7th Cir. 2010), the Seventh Circuit held that an employee had been constructively discharged when the evidence was clear that "had [he] not resigned he would have been terminated immediately." *Id.* at 502. In that case, the evidence was that the employee's supervisor had "handed [him] a letter of resignation and informed him that he could resign or be terminated immediately." *Id.* at 494. In contrast, in *Wright*, the Seventh Circuit held that an employee failed to demonstrate that she was constructively discharged where there was no evidence that the employer had decided to terminate the employee or told the employee that she would be fired, and no conduct by her supervisors suggested termination was a certainty. 798 F.3d at 530.

This case is unlike *University of Chicago Hospitals* and *Kodish* and is like *Wright*. The undisputed evidence is that at that time of his resignation, Goodman was in good

standing and Cummins had not made any decision to terminate his employment. (Goodman Dep. 160, 282, ECF No. 60-1; Jensen-Muir Decl. ¶ 29, ECF No. 60-2.) In June 2016, Cummins extended Goodman's expatriate assignment three months to allow him more time to find a role in the United States. (Goodman Dep. 199, ECF No. 60-1; Jensen-Muir Decl. ¶ 21, ECF No. 60-2.) Thus, his Vietnam assignment had an end date of October 15, 2016. (Goodman Dep. 202, ECF No. 60-1.) When Goodman resigned five weeks before on September 8, 2016, not even his end date was imminent.

It is also undisputed that at the time Goodman resigned, no one at Cummins had told Goodman that his job was in jeopardy or that he would be discharged, and Goodman understood that he could return to the United States, that is, repatriate at the end of that assignment, without having a role and find a role upon his return. (Goodman Dep. 160, 282, ECF No. 60-1; Jensen-Muir Decl. ¶ 29, ECF No. 60-2.) And in late August, Cummins had just paid for Goodman to go on a "repatriation" trip with his wife to explore job and housing opportunities in the United States, (Shi Decl. ¶ 13, ECF No. 60-3); such conduct would not raise a reasonable inference that Goodman's dismissal was inevitable. And Goodman has not identified any conduct by Cummins similar to that in *University of Chicago Hospitals* or *Kodish* or any other conduct by Cummins that would reasonably suggest his termination was a certainty.

Furthermore, before the end of his expatriation assignment, Goodman was presented with several job opportunities within Cummins, but he decided not to pursue them. (Compl. ¶¶ 106–07, ECF No. 1.) First, General Manager Enright contacted Goodman about a potential relationship manager role in his organization, with a

potentially higher salary grade level than his current level. Goodman declined to pursue the position, which was ultimately filled by Wolf, who is still in the position. (Enright Decl. ¶ 8, ECF No. 60-10.) Nusterer, the President of the Power Systems, contacted Goodman about potential project manager roles in his business unit. Even though Nusterer did not actually have a job available at that time, he was willing to find something for Goodman. (Goodman Dep. 244–46, ECF No. 60-1; Nusterer Dep. 49 & 99, ECF No. 60-9 at 4.) Goodman turned down this opportunity too, telling Nusterer he didn't trust Cummins. (Goodman Dep. 246–47, ECF No. 60-1; Nusterer Dep. 49 & Ex. 99, ECF No. 60-9 at 5.) Moreover, the Supply Chain Leader Haley told Goodman, if he could not find a role, then Haley would give him a job. (Goodman Dep. 226, ECF No. 60-1.) Goodman never pursued that opportunity either.

According to Goodman, these opportunities "were perfunctory, disingenuous, [or] 'CYA' discussions . . . raised only after [he] had" complained about Jensen-Muir. (Goodman's Br. 30, ECF No. 71.) Any finding along those lines would be based on sheer speculation, which is insufficient, *see Giles*, 914 F.3d at 1048 (stating that "any inferences must rely on more than mere speculation or conjecture"), since Goodman chose not to pursue those opportunities. A trier of fact could never know what would have happened had Goodman expressed interest in the opportunities that were presented to him. That these opportunities may have been uncertain or did not exist at the time Goodman was approached does not create a constructive discharge. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) ("a working condition does not become intolerable or unbearable merely because a 'prospect of

discharge lurks in the background'") (citation omitted); *Wright,* 798 F.3d at 531 (concluding that the employee "may have been discharged at the conclusion of the disciplinary proceeding does not amount to a constructive discharge"). Even assuming that these positions were lesser positions than the one Goodman currently held, a demotion would not have risen to the level of constructive discharge. *See, e.g, Hamer v. Neighborhood Hous. Servs. of Chi.*, No. 12 C 10150, 2015 WL 5439362, at \*12 (N.D. Ill. Sept. 10, 2015), *aff'd*, 897 F.3d 835 (7th Cir. 2018) (holding that the offer of a position with a pay reduction and "lack of further career advancement" did not "rise to the level of being intolerable" for purposes of a constructive discharge); s*ee also Rutan v. Republican Party of Ill.*, 848 F.2d 1396, 1404 (7th Cir. 1988) ("[a]n employer has not affected a constructive discharge merely because an employee believes that [he] has . . . limited opportunities for advancement") (citation omitted).

Goodman asserts that he investigated the potential role with Enright in June 2016 by discussing it with Chris Clulow, who would be "the person on the other side of the relationship that 'role' would manage." (Goodman's Br. 22, ECF No. 71.) Clulow had recommended that Goodman decline the offer because it was not a real job and he thought there was no need for a relationship manager. (Goodman Dep. 225, ECF No. 60-1.) Regardless of Clulow's views on the matter, such evidence does not raise a genuine issue for trial where the undisputed fact is that the position was filled by another and that employee remains in the position at least as of the date of the summary judgment filings in late October 2018. Goodman suggests that he wanted more time to explore the potential role and discuss it with "more mentor figures," (Goodman Br. 22,

ECF No. 71), but Enright first approached Goodman about the role in June 2016, so Goodman had more than two months within which to do so. And at the end of August when Enright again gave Goodman the opportunity to be included in the selection process, Goodman said he was not interested.

While the October 15, 2016 end date of Goodman's expatriation assignment was not speculative, that Goodman would be discharged at the end of his assignment was speculative. The question is not whether Goodman's specific assignment would end— and it would since his replacement had been hired—but instead, whether Goodman's employment would end. Even Goodman understood that he could return to the United States without a new role and find one after his return.

Even if Goodman subjectively and reasonably believed that he would be terminated, this would not be sufficient to hold Cummins liable for constructive discharge. A plaintiff must be able to show that "a *reasonable* person would believe that her employer had *acted in a manner that communicated* that the employee would be terminated imminently, not simply whether the employee reasonably thought she would be terminated." *Wright*, 798 F.3d at 528 (emphasis in original). Goodman asserts that his understanding was confirmed through discovery based on a December 2015 email in which Jensen-Muir "outlined his plan to make [Goodman] 'redundant,'" which is Cummins' terminology for termination. (Goodman Br. 2, ECF No. 71.) Clearly, since Goodman conceded he did not know of the supposed plan until discovery, it could not have informed any belief that his discharge was imminent. And any suggestion in December 2015 that Goodman's employment might be terminated if he

did not find a role before the expiration of his expatriation assignment months later would be speculation which cannot be used to raise a genuine issue of fact. *See, e.g.*, *Giles*, 914 F.3d at 1048 (the non-movant must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture"). Such speculation runs right into the undisputed evidence that Goodman was presented with several job opportunities and he chose not to pursue them. If Goodman had pursued any one of those opportunities, it is far from clear that Goodman would have been discharged.

And even if Goodman had enough evidence to raise a genuine issue of material fact as to whether he was constructively discharged, he has not presented any evidence that would permit a reasonable jury to conclude based on the evidence as a whole that his race caused the constructive discharge. *See Ortiz v. Werner Enterps.*, 834 F.3d 760, 765 (7th Cir. 2016). Goodman argues that he has a "pile" of such evidence, including Jensen-Muir's "racially charged comments and jokes," "their differing intensity levels depending on the racial or cultural makeup of his audience," and "the fact that [Jensen-Muir] has never hired a single African-American as a direct report." (Goodman Br. 33, ECF No. 71.) Goodman could not recall any of the alleged jokes or comments, and stated that they were about Indians and Chinese rather than African Americans. (Goodman Dep. 288–89, ECF No. 60-1.) Even if Jensen-Muir never hired an African American direct report, there is no evidence in the record that shows the racial makeup of all the candidates from which he made his hiring decisions. The inadmissible hearsay offered by Goodman to establish that Jensen-Muir

16

would not hire individuals with dark skin fails to create a genuine issue on summary judgment. *See, e.g., Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible hearsay cannot be used to defeat a properly supported summary judgment motion).

Goodman asserts that similarly situated non-African American employees were treated more favorably at the end of their expatriation assignments and that there is evidence that "bridge or project roles are often used as temporary placeholders until an employee finds a permanent job," (Goodman Br. 33, ECF No. 71), whereas he was not offered a suitable role or the opportunity to return to the United States in a temporary role (Goodman Br. 34, ECF No. 71). But the evidence is that several opportunities were presented to Goodman, and he declined to pursue them. Goodman complains that Jensen-Muir's treatment of him changed for the worse after the April 2015 retirement of Jensen-Muir's supervisor Pamela Carter, who, like Goodman, is African American, and that Cummins deviated from its repatriation policy with regard to Goodman. Yet Goodman offers nothing more than speculation to suggest that such actions or inactions were motivated by his race.

The Court finds that Goodman has presented insufficient evidence to permit a reasonable factfinder to conclude that a reasonable person would have believed that Cummins had acted in a manner that communicated that Goodman would be immediately and unavoidably terminated. And he has come forward with insufficient evidence to permit a reasonable factfinder to conclude that his alleged constructive discharge was motivated by his race. Therefore, Goodman cannot defeat Cummins'

motion for summary judgment on his constructive discharge claim. Because Good-man has abandoned his other claims, summary judgment should be granted to Cum-mins on all claims in this case.

## Conclusion

For the foregoing reasons, the Court **grants** Defendant's Motion for Summary Judgment (ECF No. 60). Final judgment will be entered.

**SO ORDERED.**

Date: _____9/27/2019_____

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Caridad Austin
FAEGRE BAKER DANIELS LLP
carita.austin@FaegreBD.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP (Indianapolis)
ellen.boshkoff@faegrebd.com

Kevin Dale Koons
KROGER GARDIS & REGAS LLP
kdk@kgrlaw.com

Steven E. Runyan
KROGER GARDIS & REGAS LLP
ser@kgrlaw.com